**EURO–PRO CORPORATION, Plaintiff,**

v.

**TRISTAR PRODUCTS, INC., Defendant.**

**Tristar Products, Inc., Plaintiff,**

v.

**Euro–Pro Corporation, Aviva Rosenzweig, and Mark Rosenzweig, Defendants.**

**Nos. 01–607 (WGB), 01–723(WGB).**

United States District Court,
D. New Jersey.

July 20, 2001.

Lindsey H. Taylor, Goodwin Procter LLP, Roseland, NJ, for Plaintiff Euro–Pro Corporation.

Eugene J. Sullivan, Tompkins, Mcguire, Wachenfeld & Barry, Newark, NJ, for Defendant Tristar Products, Inc.

## OPINION

BASSLER, District Judge.

Plaintiff Euro–Pro Corporation ("Euro–Pro") markets and sells a hand-held vacuum called "The Shark." Defendant Tristar Products ("Tristar") markets and sells a hand-held vacuum being sold under the name "Turbo Tiger." Central to this suit is Euro–Pro's claim that Turbo Tiger is virtually identical to The Shark and was designed to trade off of the good will created by Euro–Pro.[1]

Euro–Pro moves[2] pursuant to Fed. R.Civ.P. 65 for a preliminary injunction to prevent Tristar from selling, importing, advertising or promoting Turbo Tiger. For the following reasons, Euro–Pro's motion for preliminary injunctive relief is **denied**.

This Opinion contains the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## I. BACKGROUND

### A. Procedural History

On February 6, 2001, Euro–Pro filed a complaint against Tristar alleging trade dress infringement, false advertising, unfair competition, and false designation of origin, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and the New Jersey statutory law against unfair competition, N.J.S.A. § 56:4–1, et seq. and N.J.S.A. 56:4A–1, et seq. On February 12, 2001, Tristar filed suit against Euro–Pro, Aviva Rosenzweig and Mark Rosenzweig[3] alleging false advertising and unfair competition in violation of the Lanham Act, and false "marking" in violation of 35 U.S.C. § 292. The two cases were consolidated on June 21, 2001.

On or about May 29, 2001, Euro–Pro requested an Order to Show Cause why a

---

**1.** This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332.

**2.** Euro–Pro failed to file its Order to Show Cause application for a preliminary injunction with the Clerk's Office. Accordingly, Euro–Pro's application is technically not pending. Nevertheless, the Court will rule on Euro–Pro's application.

**3.** Mark Rosenzweig is President of Euro–Pro. Aviva Rosenzweig is Mark Rosenzweig's mother. She is responsible for supervising and controlling the logistical and administrative aspects of the business as well as its daily finances. (Deposition Tr. of Aviva Rosenzweig ("A. Rosenzweig Dep.") attached as Ex. 4 to Certification of Roger Colaizzi ("Colaizzi Cert.") at 8:18–22, 25:9–14.)

preliminary injunction should not issue enjoining Tristar from infringing the trade dress of Euro–Pro's The .Shark and from falsely advertising[4] the allegedly infringing Turbo Tiger. The Court set an expedited discovery schedule. Oral argument was heard on July 20, 2001.

### B. *Facts*

Euro–Pro markets and sells various houseware products throughout the United States and Canada, including a "600 Watt Turbo Power Hand Held Vac" vacuum cleaning system called "The Shark." Euro–Pro first introduced its 600 watt hand-held vacuum into the marketplace on November 29, 1999, on the Home Shopping Network. (*Id.* at ¶ 11.) Unlike, for example, the Black & Decker Dustbuster and the Royal Dirt Devil, which have squared off boxy shapes, Euro–Pro's hand-held vacuum is curved and is called "The Shark" because of its shark-like appearance.[5] (*See* Certification of Mark Rosenzweig ("Rosenzweig Cert."), at ¶¶ 7–9.) The Shark is available in metallic silver, which is the color featured in Euro–Pro's print advertisements and is the greatest selling color scheme; it is also offered in a green and white color scheme, as well as translucent blue, red, gray or purple. (*Id.* at ¶ 14.) The Shark has a shoulder strap and comes with two accessory brush attachments and an extension hose.

The Shark's appearance, while distinct from any other hand-held vacuum then sold in the United States, is purely decorative. (*Id.* at ¶ 9.) The true advantage of The Shark over other handheld vacuums in the marketplace at that time was the ex-traordinary suction power derived from its ultra-small 600 watt motor. (*Id.* at ¶ 9.)

In Home Shopping Network demonstrations, The Shark is shown picking up a bowling ball and then the table on which the bowling ball was placed. The Shark is also demonstrated vacuuming a computer keyboard, different types of dirt and debris arranged in lines on a table (elbow macaroni, dry beans, pet hair, metal nuts, rock salt, glitter, bird seeds, popcorn), and draining a large glass of sand. (*Id.* at ¶ 11.) Since its introduction, The Shark has appeared regularly on the HSN and has reached millions of households. (*Id.* at ¶ 12.)

The techniques employed by Euro–Pro in demonstrating The Shark were repeated with still photographs in Euro–Pro's print advertisement. (*See id.* at Ex. B.) The print advertisements have been in nationally circulated publications such as Good Housekeeping, People Weekly, USA Weekend, TV Plus, The National Enquirer, The Wall Street Journal, and others. (*Id.* at ¶ 13.) Advertisements have also been included in the in-flight magazines for United Airlines, U.S. Airways, and Southwest Airlines. (*Id.*) Sale of The Shark has been offered in catalogues such as Spiegel, Bloomingdales, Electric Odessy, Herrington, Fingerhut and the Chef's Catalogue. (*Id.*)

In total, Euro–Pro has spent approximately $7 million for promotion on television and in print. (*Id.*) Since its introduction, more than 700,000 units have been sold in the United States and an additional 200,000 units in Canada. (*Id.* at ¶ 15.)

---

**4.** Because Euro–Pro has not briefed the false advertising claim, the Court declines to undertake a false advertising analysis.

**5.** The Japanese company Toshiba originally developed the product design that Euro–Pro adopted as its trade dress for The Shark. Toshiba, however, has not yet perfected, of-fered to sell, or sold any vacuum cleaners in the United States using that product design. Euro–Pro contends that its priority of use of the product design in commerce in the United States conclusively establishes its trade dress rights. Because Tristar does not dispute this issue, the Court need not address it.

In January 2001, while at a trade show, Euro–Pro's President, Mark Rosenzweig ("Rosenzweig"), first discovered the existence of the Princess [6] "Turbo Tiger." The curved design of the hand-held Turbo Tiger vacuum is virtually identical to The Shark, except that it has a closed handle, rather than an open handle, and comes in a metallic gold color. Like The Shark, Turbo Tiger also has a shoulder strap and comes with accessory brush attachments and an extension hose.

The television advertisements for Turbo Tiger, which began running in February 2001, (Deposition Tr. of Steven Sowers ("Sowers Dep.") attached as Ex. 1 to Colaizzi Cert. at 39:24–40:3), are infomercials that begin with the display of a live tiger and spokesperson Billy Mays. The infomercials then show the demonstrator lifting both two bowling balls and a table with Turbo Tiger. Turbo Tiger is also shown vacuuming a computer keyboard, different types of dirt and debris arranged in lines on a table (the same as those in The Shark commercial), and draining a large glass of sand. Throughout and at the end of the infomercial, is the statement—"if it doesn't say Princess, it is not the original Turbo Tiger." The infomercial also makes statements such as "unleash a tiger in your home."

While there are similarities in appearance and marketing, there is no dispute that the packaging of The Shark and Turbo Tiger are different. (See Pl.'s Reply Br., at 10.) Moreover, the products are available in different retail stores. The Shark is available at Wal–Mart, K–Mart, and Target. (Rosenzweig Cert., at ¶ 16.) Turbo Tiger is available at Walgreen's, Kohl's, Bed Bath & Beyond, and Linens 'N Things. (Sowers Dep. at 41:5–17.)

Euro–Pro argues that the overall "look" of "the Shark" has been copied by Tristar; it also identifies in its Complaint the product's specific trade dress features:

(1) a hard shell, tubular body with round, conical front and rear ends;

(2) a 2–3 inch tapering vertical cross-section of the body near the horizontal mid-section of the body protrudes perpendicular to the curvature of the machine body in a rounded manner providing a pregnant-like feature to that area of the body;

(3) the front of the machine has an oval-shaped opening positioned toward the underside of the front that acts as the intake area of the machine;

(4) the rear of the machine has two equidistant protrusions that extend out from the rear of the machine in line with the overall body of the machine;

(5) a rounded handle protruding from the top of the machine beginning approximately at the center of the body then extending to the rear of the machine with the end tapered downward;

(6) the handle has an arc formation that follows the curvature of the body of the machine;

(7) an on/off switch positioned along the top of the body of the machine near the front base of the handle;

(8) two connection loops for the shoulder strap that are positioned along the top of the body of the machine near the front base of the handle and the rear of the body of the machine;

(9) a front cone release button positioned to the left of the on/off switch near the front base of the handle (as viewed from the front of the machine to the viewer's left);

(10) the release button protrudes out from the body of the machine yet ends

**6.** Tristar is the exclusive licensee in North America for Turbo Tiger and several other products that belong to a foreign company called Princess.

in a tapered fashion following the curvature of the body of the machine;

(11) the rear portion of the machine has a series of vertical airflow vents;

(12) the underside of the machine has a rounded protrusion that runs across the entire underside of the machine perpendicular to the flow of the machine body.

(Compl.¶ 11.)

## II. *DISCUSSION*

### A. *Standard for Preliminary Injunction*

Whether or not a court should grant a preliminary injunction is committed to the sound discretion of the trial court. *Penn Galvanizing Co. v. Lukens Steel Co.,* 468 F.2d 1021, 1023 (3d Cir.1972). But a court must always be mindful that an injunction is "an extraordinary remedy which should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989).

In exercising its discretion, the court must be convinced that all four of the following factors favor preliminary relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer "irreparable harm" without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *Clean Ocean Action v. York,* 57 F.3d 328, 331 (3d Cir.1995); *American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1426 (3d Cir. 1994).

### B. *Likelihood of Success on the Merits*

#### 1. *Trade Dress Infringement Standard*

Unregistered trade dress infringement, sometimes called unprivileged imitation, is essentially a subset of unfair competition and is prohibited by § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[7] *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1140–41 n. 2 (3d Cir.1986). Trade dress constitutes a "symbol" or "device" protectable under § 43(a) of the Lanham Act. *See Wal–Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Section 43(a) provides in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

The term "trade dress," which originally referred only to the packaging or "dressing" of a product, has recently been held to also include the design of a product. *See Wal–Mart Stores,* 529 U.S. at 209, 120

---

7. The same rules under the Lanham Act prohibit trademark infringement. 1 *McCarthy on Trademarks and Unfair Competition,* § 8.1, at 8–4 (2001).

S.Ct. 1339; *see e.g. American Greetings,* 807 F.2d at 1140 (noting that in addition to product's packaging or labeling, trade dress protection includes "the appearance of the [product] itself"). The Lanham Act protection of trade dress "extends to 'the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1439 (3d Cir.1994) (citations omitted). In other words, it is the overall appearance of the products that is critical; all of the features of a particular trade dress should be considered together. *Id.* Thus, even if no particular individual component or feature would be considered distinctive in isolation, a product design may still be protectable. *Id.* Nevertheless, while the "totality of elements" defines trade dress, the plaintiff is not precluded from defining "a list of elements consisting of less than the totality of features." 1 *McCarthy on Trademarks and Unfair Competition,* § 8.3, at 8-8, 8-9.

To establish infringement of its trade dress, the plaintiff must prove that (1) the allegedly infringing feature is non-functional, (2) the feature is inherently distinctive or has acquired secondary meaning, and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product. *Wal–Mart,* 529 U.S. at 210, 120 S.Ct. 1339; *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 773, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *American Greetings,* 807 F.2d at 1141. The elements are "not significantly different" under federal and New Jersey law. *American Greetings,* 807 F.2d at 1141.

The Court need not examine non-functionality and likelihood of confusion because even assuming that Euro–Pro can prove those two elements, it cannot establish secondary meaning.

## 2. Inherently Distinctive or Secondary Meaning

Although trade dress infringement requires the plaintiff to show that the product feature is inherently distinctive *or* has acquired secondary meaning, the Court need not engage in the "inherently distinctive" analysis because Euro–Pro does not seek to protect The Shark's packaging, but rather, the design and overall impression of its product. The Supreme Court has unequivocally held that product design (as well as color) is not inherently distinctive for purposes of an action under the Lanham Act for infringement of an unregistered trade dress. *Wal–Mart,* 529 U.S. at 212, 120 S.Ct. 1339. Therefore, Euro–Pro must show secondary meaning in order to satisfy the second element of a trade dress violation. *See id.* at 216, 120 S.Ct. 1339. Generally, secondary meaning in a product design case is not easy to prove. *Duraco,* 40 F.3d at 1453.

■ Acquiring secondary meaning means that "'in the minds of the public, the primary significance of a product feature or term [is] to identify the source of the product rather than the product itself.'" *Duraco,* 40 F.3d at 1440 (citing *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). To prove secondary meaning in alleged trade dress, plaintiff need only prove that consumers associate the trade dress with a single source, "'even if the name of that source is unknown.'" 1 *McCarthy on Trademarks and Unfair Competition,* § 8.8, at 8–30.

Factors that may be considered in a finding of secondary meaning in a product design include:

(1) plaintiff's advertising expenditures, measured primarily with regard to those advertisements which highlight the supposedly distinctive, identifying feature,

[citation omitted]; (2) consumer surveys linking the distinctive product [design] to a particular, single source (although the identify of the source need not be known); and (3) length and exclusivity of use. *Duraco,* 40 F.3d at 1452. The fact of copying may also be considered in determining the existence of secondary meaning. *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 619 F.Supp. 1204, 1221 (D.N.J.1985) (citing *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 152 (3d Cir.1984)). The only direct evidence of secondary meaning are probably consumer surveys and testimony; however, the plaintiff may rely solely on other sources, which constitute circumstantial evidence. *Id.*

■ Here, Euro–Pro has not provided any consumer surveys. Instead, Euro–Pro claims that "the Shark" has acquired secondary meaning as evidenced by its expenditure of approximately $7 million in television and print advertising for The Shark since first introducing the product into the marketplace on November 29, 1999. (*See* Rosenzweig Cert., at ¶¶ 11, 13.) The Shark has appeared on the Home Shopping Network and its affiliates hundreds of times and has been extensively advertised in nationally circulated publications and catalogues. (*Id.* at ¶¶ 12–13.)

Such advertising expenditures, as mandated in *Duraco,* 40 F.3d at 1452, must be measured "primarily with regard to those advertisements which highlight the supposedly distinctive, identifying feature." *See First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir.1987) (upholding district court's finding that there was no secondary meaning because "advertising campaign ha[d] not stressed the color and shape of the antifreeze jug"

and "engender[ed] consumer identification with the yellow, F-style jug" by, for example, urging consumers to look for the "familiar yellow jug")[8]; *see also Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC,* 107 F.Supp.2d 82, 84 (D.Mass.2000) (finding that "trade dress sought to be protected has not been in circulation for a sufficient period of time to support secondary meaning as a matter of law, and plaintiff's advertising makes no use of the trade dress elements for product identification, as in the case of a label or name.")

In this case, although Euro–Pro's promotions and advertisements mention the "ergonomic design" of The Shark, the advertisements do not focus or "highlight" the supposedly distinctive, identifying outer shell features of The Shark that Euro–Pro seeks to protect. Rather, the television advertisements emphasize The Shark's "extraordinary suction power" and "ultra-small 600 watt motor." (*Id.* at ¶ 9.) In any event, the distinctiveness and identifying appearance of The Shark is dubious in view of Euro–Pro's admission that other hand-held vacuum cleaning systems that allegedly do not infringe The Shark's trade dress are designed with a cylindrical body and have an on/off switch positioned along the tope of the body of the machine near the front base of the handle. (Pl.'s Response to First Requests for Admission, Nos. 3, 4.)

Euro–Pro also claims that its product design is protectable trade dress because for more than one year, The Shark was the only vacuum cleaner on the market in this country with its distinctive design. One year, however, is not long enough to create an inference that consumers associate The Shark trade dress with a single source—Euro-Pro. *See Duraco,* 40 F.3d at 1454 (affirming district court's finding of no sec-

**8.** Contrary to Euro–Pro's contentions, the court in *First Brands Corp.* did not find that the yellow container had never been shown or referenced in the plaintiff's promotion of the product.

ondary meaning and in doing so, noting that plaintiff's exclusive sale of Grecian style plastic planter for five years was "not so long a time as to raise a strong inference of consumer association with a single source.")

Next, to show secondary meaning, Euro–Pro relies on the fact that since the introduction of The Shark, more than 700,-000 units have been sold in the United States and an additional 200,000 units in Canada. (Rosenzweig Cert. at ¶ 15.) However,

> [s]ales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a trademark case, since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature of combination of features.

*Duraco,* 40 F.3d at 1452. Stated differently, the successful sales of The Shark may be because consumers desire the product itself, i.e. a powerful hand-held vacuum, rather than because consumers identify the source and care about who the source is.

Finally, Euro–Pro claims that Tristar copied wholesale the overall appearance of The Shark into the Turbo Tiger. While attempts to copy a product design is persuasive evidence of secondary meaning, it is not dispositive. *Ideal Toy Corp. v. Plawner Toy Manufacturing Corp.,* 685 F.2d 78, 82 (3d Cir.1982); *Duraco,* 40 F.3d at 1453. "[T]he copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product." *Duraco,* 40 F.3d at 1453.

Moreover, "[t]he inference of unfair competition will be even weaker where the copier takes conspicuous steps—whether in packaging, trademark, marketing techniques, or otherwise—to distinguish its

product from its competitor's." *Id.* Here, Euro–Pro relies on the similarities in advertising to support its claim that The Shark has acquired secondary meaning. For example, commercials for both products display the hand held vacuum cleaning up the same spills, e.g. soil, dry beans, pet hair, metal nuts, rock salt, glitter. Euro–Pro admits, however, that other allegedly non-infringing sellers or distributors of vacuum cleaning systems have included in their advertisements for such vacuum cleaning systems one or more demonstrations showing their system lifting or controlling one bowling ball (albeit not two balls) or vacuuming various particles. (Pl.'s Response to First Requests for Admission, Nos. 9, 10.)

Further, Tristar identifies the conspicuous steps it has taken to differentiate Turbo Tiger from The Shark and to develop Turbo Tiger as a brand-name product by: (1) mentioning either Tristar or Princess as the source; (2) prominently showing "Turbo Tiger" on the vacuum; and (3) using a real tiger in the television advertisements.

Upon examining these various factors, the Court concludes that Euro–Pro has failed to provide sufficient evidence to establish that the overall appearance of The Shark has acquired secondary meaning. Therefore, Euro–Pro is not likely to succeed on the merits of its claim. Accordingly, the Court need not engage in an analysis of the remaining factors to be considered before a preliminary injunction can issue.

## III. CONCLUSION

For the reasons noted herein, Euro–Pro's motion for a preliminary injunction is **denied.**