The STRAUMANN COMPANY,
a Delaware corporation,
Plaintiff,

v.

LIFECORE BIOMEDICAL INCOR-
PORATED, a Minnesota corpo-
ration, Defendant.

No. CIV.A. 00–10602–RCL.

United States District Court,
D. Massachusetts.

Aug. 29, 2003.

Dean C. Eyler, J. Thomas Vitt, Dorsey & Whitney LLP, Minneapolis, MN, Steven L. Feldman, Barry Y. Weiner, Shapiro, Israel & Weiner, P.C., Boston, MA, Scott C. Gladstone, Scott C. Gladstone, Newton,

MA, for Lifecore Biomedical, Incorporated.

Jason C. Kravitz, Cornelius J. Moynihan, Jr., John R. Pagliaro, Nixon Peabody, LLP, Boston, MA, Peter R. Munson, Douglas E. Olson, Kimberly S. Steckling, Paul, Hastings, Janofsky & Walker LLP, San Diego, CA, for Straumann Company.

## MEMORANDUM AND ORDER ON DEFENDANT LIFECORE BIOMEDICAL'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE SUMMARY JUDGMENT MATERIALS

LINDSAY, District Judge.

The plaintiff, The Straumann Company ("Straumann" or the "plaintiff"), a manufacturer of dental implants, has brought a four-count complaint against the defendant Lifecore Biomedical, Incorporated ("Lifecore" or the "defendant"), alleging: (1) false designation of origin under 15 U.S.C. § 1125(a) (Lanham Act § 43(a)); (2) unfair competition under Mass. Gen. Laws ch. 93A §§ 2, 11; (3) common law trademark and trade dress infringement; and (4) common law unfair competition. All of these claims arise from Lifecore's production of its "Stage–1" dental implant. Straumann alleges that the Stage–1 implant illegally copies the trade dress of one of Straumann's own implants, the "Straumann–ITI" design. Straumann claims protection for the overall design of its implant and for certain of its design features, specifically (1) the external thread, (2) the gray color of the lower portion of the implant, (3) the shiny trumpet-shaped upper portion, (4) the rounded bottom and (5) the solid abutment.

After limited discovery, Lifecore moved for summary judgment on the issue of functionality, claiming that the overall design of the Straumann implant and the features in question were not protectable under the trademark laws because they were functional. In an order dated February 6, 2002 (Docket No. 100), clarified by another order dated May 3, 2002 (Docket No. 113), I held, based on the undisputed facts then of record, that all the specific features at issue as to Straumann's implant, except the rounded bottom and the curved upper surface of the thread, were functional, as a matter of law. I also concluded that there was a triable issue of fact as to the functionality of the *overall design* of the implant.

Discovery has now been completed. Before me are Lifecore's renewed motion for summary judgment and its motion to strike certain summary judgment materials. By the renewed summary judgment motion, Lifecore solicits a revisiting of my ruling as to the triability of the question of the functionality of the overall design of the Straumann implant as well as a reconsideration of the ruling that the rounded bottom and the curved upper structure of that implant are functional. Because I have revisited these issues and now believe that the present renewed motion disposes of this case, I need not address the motion to strike. I turn, then, to the motion for summary judgment.

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Suarez v. Pueblo Intern. Inc.*, 229 F.3d 49, 53 (1st Cir.2000). In ruling on the motion, the court is to draw all reasonable inferences in favor of the non-moving party. *Suarez*, 229 F.3d. at 53.

 As a preliminary matter, it is important that I distinguish between trade dress claims based on product design and trade dress claims based on product pack-

aging.[1] To prevail on a trade dress claim based on product *design,* a party seeking trade dress protection must show: (1) the non-functionality of the design; (2) the existence of secondary meaning and (3) a likelihood of confusion. *See Wal–Mart Stores v. Samara Bros.,* 529 U.S. 205, 210–215, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). By contrast, in a product *packaging* case, the plaintiff may prevail if he shows either that the trade dress is "inherently distinctive" *or* that it has acquired secondary meaning, the other two elements of the claim (non-functionality and likelihood of confusion) being identical to the elements of trade design claim. *Id.* The difference in treatment is warranted because: "Consumers are aware that, almost invariably, even the most unusual of product designs ... is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* at 213, 120 S.Ct. 1339. In addition, "[c]onsumers should not be deprived of the benefits of competition with regard to the *utilitarian* and *esthetic* purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suits against new entrants based upon alleged inherent distinctiveness." *Id.* (emphasis added). If there is doubt as to whether a given case involves product packaging or product design, a court should treat the case as one involving a product design. *See Yankee Candle Co. v. Bridgewater Candle Co.,* 259 F.3d 25, 41 (1st Cir.2001) (citations omitted).

After reviewing the parties' voluminous submissions and after having heard oral argument, I find that this case can be reduced to two issues: (1) whether there is an issue of fact as to the non-functionality of the overall design of the Straumann implant; and (2) whether the non-functional features of that implant have acquired secondary meaning.

I will examine these questions in turn. I note that my disposition of these questions does not require that I reconsider my ruling that the non-functionality of the rounded bottom and the upper part of the thread of the Straumann implant presents an issue of fact.

*Is there an issue of fact as to the non-functionality of the overall design of the implant ?*

The Supreme Court recently has given new guidance with respect to the meaning of "functionality" in trademark and trade dress cases. *See TrafFix Devices, Inc., v. Marketing Displays, Inc.,* 532 U.S. 23, 31–34, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). The *TrafFix* Court reversed a Sixth Circuit decision which had held that a series of features was not functional because the features in question were not a "competitive necessity" and protecting them would not impact competitors "negatively enough." *Id.* The Sixth Circuit improperly had based its ruling in part on what the Supreme Court called "speculation about other design possibilities." *Id.* The Supreme Court defined functionality differently, however, ruling that a feature is functional when it is essential to the use or purpose of the device *or* when it affects the cost or quality of the device. *Id.* The Court thus clearly rejected the notion that "competitive necessity" is a necessary test for functionality. *Id.* For the plaintiff to establish that the "overall design" of its implant is non-functional, it must show that the *arrangement* of the product features is "arbitrary." *See I.P. Lund Trad-*

---

**1.** Frequently, Straumann, in its papers, has sought to support its claims by relying on product packaging cases. *See, e.g.,* Plaintiff's Memorandum in Opposition at 2 (citing

*Clicks Billiards Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1261 (9th Cir.2001) (product packaging case involving pool halls)).

*ing ApS v. Kohler Co.*, 163 F.3d 27, 37 (1st Cir.1998) (citing *Taco Cabana Int'l Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir.1991) ( "[A] particular *arbitrary* combination of functional features, the combination of which is not itself functional, properly enjoys protection.")). A credible argument can be made that Supreme Court jurisprudence has weakened, or changed the meaning of, the "arbitrariness" standard as set forth in *I.P. Lund. But see Yankee Candle*, 259 F.3d at 40 n. 8 ("Although we agree as to the functionality of the display, we note that a combination of functional elements may itself be entitled to trade dress protection," (citing *I.P. Lund*, 163 F.3d at 37)). The *I.P. Lund* "arbitrariness" standard is derived from a Fifth Circuit product *packaging* case, *Taco Cabana*, which involved the overall appearance of a restaurant.[2] *See Taco Cabana*, 932 F.2d at 1119. The *Taco Cabana* case, however, predates the sharp distinction between product design and product packaging cases drawn by the Supreme Court in *Wal–Mart Stores. See Wal–Mart Stores*, 529 U.S. at 210–215, 120 S.Ct. 1339. In *Wal–Mart Stores*, the Supreme Court held that, to prevail on a trade dress claim based on product design, a party seeking protection must show secondary meaning and cannot rely on its product's "inherent distinctiveness." *Id.* at 212–14, 120 S.Ct. 1339. The "arbitrariness" test also predates the Supreme Court's clarification of the "functionality" concept in *TrafFix*, discussed above.

Both these developments suggest that the showing of non-functionality required of a plaintiff seeking trade dress protection of the "overall design" of its product may now be higher than it was when *Taco Cabana* was decided. Some courts have therefore held that, when *all* the component parts of a product design are functional, "it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional." *See Antioch Co. v. Western Trimming Corp.*, 196 F.Supp.2d 635, 643 (S.D.Ohio 2002) (citing *Leatherman Tool Group, Inc. v. Cooper Industries*, 199 F.3d 1009, 1013 (9th Cir.1999)). Because the applicable standard would not make a difference in this case, and the First Circuit adheres to the arbitrariness standard of *I.P. Lund*, I will apply that test to determine whether the overall design of the Straumann implant is functional. *See Yankee Candle*, 259 F.3d at 40 n. 8.

As noted earlier, I determined in a prior ruling that there was a triable issue as to the functionality of the overall design of the Straumann implant. Developments in the case have caused me to reconsider that ruling.[3] After considering the evidence that has emerged in discovery, I am now persuaded that Straumann cannot establish at trial that the overall design of its implant is non-functional: Straumann simply has not produced competent evidence supporting its claim of non-functionality of the overall design of its implant.

First, Dr. John Brunski, Straumann's expert on functionality, did not opine on overall design as such; he focused instead on the non-functionality of individual features of the Straumann implant. But even in this exercise, he repeatedly applied the wrong legal standard for functionality: his conclusions were

2. The Supreme Court's decision in *Taco Cabana* did not address this issue.

3. There is no prohibition against my reconsidering a prior *denial* of summary judgment, because a ruling denying summary judgment does not constitute "law of the case." *See Bethlehem Steel Export Corp. v. Redondo Const. Corp.*, 140 F.3d 319, 321 (1st Cir.1998) (interlocutory orders do not constitute law of the case prohibiting reconsideration).

based on his understanding that a given feature must be "necessary" or "essential" in order to be functional. *See, e.g.*, June 13, 2002 Affidavit of Thomas Vitt, Exhibit 15, Deposition of John Brunski ("Brunski Dep.") at 51–54, 132–34. To the extent that Dr. Brunski focuses solely on the question of whether the feature is necessary, he uses a standard that only partially reflects the Supreme Court's holding in *TrafFix* that a feature is functional when it is essential to the use or purpose of the device *or* when it affects the cost or quality of the device. *TrafFix Devices, Inc.*, 532 U.S. at 31–34, 121 S.Ct. 1255. As noted earlier, the Supreme Court rejected the notion that a feature is functional only if it is a "competitive necessity." *Id.* Because Dr. Brunski's opinion is addressed to only half of the functionality question, that is whether the design is essential, it is based on an erroneous legal standard, and the opinion cannot defeat summary judgment.[4] *See Carapellucci v. Town of Winchester*, 707 F.Supp. 611, 620 (D.Mass.1989) (Keeton, J.) (affidavit of an expert who erroneously stated in his deposition that "accepted standards" were synonymous with "state of the art" creates a risk that the opinion is based on an erroneous legal premise, and, as a result, cannot defeat summary judgment).

As to the specific issue of whether a given feature of the Straumann implant "affects costs or quality," Dr. Brunski's analysis of how a feature may affect cost or quality is again steeped in the mistaken notion that functionality of a feature is defined exclusively in terms of whether the feature is essential. The following exchange from his deposition demonstrates that point.

Q: What is the basis for saying that that design [the Straumann design] is not affecting the quality of the implant?

A: [By Dr. Brunski]: Quality I would use in the sense of . . . [i]ts ability to do the job that it's intended to do in a satisfactory manner so it's not essential necessarily to do that, the curved upper surface, et cetera.

Brunski Dep. at 133.

Moreover, Dr. Brunski repeatedly stated that he could not exclude that the features in question in the Straumann implant *could* have an influence, albeit a small one, on cost or quality. *See, e.g.*, Brunski Dep. at 183–85, 189–93, 247. Thus, Dr. Brunski does not exclude that changes in the overall design might affect the cost or quality of the implant.

In addition, apart from rehearsing arguments I rejected in my earlier ruling regarding the non-functionality of many of the individual features of Straumann's implant, the plaintiff has not offered any competent evidence regarding *the way the individual features are arranged*. The

---

4. Dr. Brunski's and thus Straumann's fundamental misunderstanding of the concept of functionality renders it unnecessary for me to decide the hotly contested question of whether the availability of alternative designs can be evidence of non-functionality. *Compare Valu Engineering, Inc., v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed.Cir.2002) (citing 1 McCarthy on Trademarks and Unfair Competition, § 7:75, 7–180–1 (4th Ed.2001)) (alternative designs are part of the "mix" of evidence on the issue of functionality) with *Eppendorf Netheler Hinz GmbH, v. Ritter GmbH*, 289 F.3d 351, 357 (5th Cir. 2002) ("The availability of alternative designs is irrelevant."); *Antioch Co. v. Western Trimming Corp.*, 196 F.Supp.2d 635, 640 (S.D.Ohio 2002) (same). For Straumann, the question of whether alternative designs are relevant to functionality is a question viewed only from the perspective of whether a given feature is essential, that is, whether it is a competitive necessity. Such a perspective is too myopic under *TrafFix*, and therefore the question of alternative designs need not be addressed.

closest thing to an argument made by Straumann on this issue is found in a declaration by Dr. Brunski ("Brunski Decl."):

> The shiny trumpet is at the top of the implant because of the ornamental appearance. The top would be more useful if it were colored gold like the 3i implant so that it would not show through the gum. Many features of the implant of the top of the implant, including the angle of the shoulder and the outward curvature are not present for any "functional purpose." Most successful implants have a thread pattern, which comes up much higher on the implant. Thus it is wrong to say that the thread pattern is placed on the implant for a functional purpose. Brunski Decl. ¶ 41

Presumably, this statement is meant to convey the idea that the arrangement of the individual features of the Straumann implant is arbitrary and thus to explain that the overall design of the implant is non-functional. I do not regard this as evidence sufficient to defeat summary judgment. As an initial matter, I note that the quoted statement is inconsistent with the statement in Dr. Brunski's deposition that he *had not* examined, in connection with preparing his expert report, whether the *arrangement* of the individual elements was arbitrary or whether certain changes in the arrangement features would add to cost. *See* Brunski Dep. at 266–268.

◼ The second flaw in this passage actually reflects Dr. Brunski's failure to examine whether the arrangement of the features is arbitrary: he does not explain the basis for his conclusion that "many features of the top of the implant, including the angle of the shoulder and the outward curvature are not present for any 'functional purpose.' " [5] Brunski Decl. ¶ 41. Conclusory expert opinions lacking a proper factual basis are insufficient to defeat summary judgment, and are subject to exclusion under Fed.R.Civ.P. 56(e). *See, e.g., Hayes v. Douglas Dynamics,* 8 F.3d 88, 92–94 (1st Cir.1993) (stating that an expert affidavit must "at least include the factual basis and the process of reasoning which makes the conclusion viable" in order to defeat summary judgment); *see also Schubert v. Nissan Motor Corp.,* 148 F.3d 25, 30–31 (1st Cir.1998) (affirming the district court's decision to exclude deficient expert opinions under Fed.R.Civ.P. 56(e)). The conclusory nature of Dr. Brunski's conclusions in paragraph 41 of his declaration is reason enough to exclude them under Fed.R.Civ.P. 56(e). Hence, his statements regarding the arrangement of the features are insufficient to defeat summary judgment.

Straumann therefore is left with no competent evidence to show that the overall design of its implant is "arbitrary" or non-functional. I conclude then that there is no genuine issue of fact as to the non-functionality of the overall design. Lifecore is entitled to summary judgment on this issue.

*Have the non-functional features acquired secondary meaning?*

◼ The fact that the overall design is functional does not preclude an examination of whether the two arguably non-functional features— i.e. the rounded bottom and the top of the thread— have acquired secondary meaning and are thus

---

5. The remaining opinions expressed in the quoted paragraph fare no better. His references to the non-functionality of the "shiny trumpet" and the color of the implant are inconsistent with my earlier determination that these two features are functional as a matter of law.

subject to protection. *See Textron, Inc., v. U.S. Intern. Trade Comm.*, 753 F.2d 1019, 1027 (Fed.Cir.1985) (holding that the "overall design" of the product was functional, but proceeding to examine whether the two arguably non-functional features had acquired secondary meaning). Secondary meaning exists when "in the minds of the public, the *primary* significance of a product feature or term is to identify the source of the product rather than the product itself." *See, e.g., I.P. Lund,* 118 F.Supp.2d at 103. (citation omitted) To state the matter in more precise terms, what the law requires is that consumers view the design as indicating that the product comes from a *single* source, even if they cannot name the source in question. *Id.* at 107.

Furthermore, a party claiming that a product feature has achieved secondary meaning must make a "vigorous" showing that some non-functional feature is seen by consumers as *primarily* indicating its origin. *See Yankee Candle,* 259 F.3d at 43 & n. 14. That is to say, the evidence of secondary meaning must distinguish between functional features which are not subject to protection and non-functional features which may be protected. *See I.P. Lund,* 163 F.3d at 42 (defining a trade dress claim based on product design as a claim that "something in the design *which is not functional* [must serve] primarily to signify the source of the [product] and not primarily to signify that it is an aesthetically pleasing [product]") (emphasis added); *Textron,* 753 F.2d at 1027 (evidence that the "overall design" has acquired secondary meaning is insufficient to defeat summary judgment; when most features and the overall design itself are functional, the evidence must show that the individual, non-functional features have acquired secondary meaning). This approach is fully consistent with the Supreme Court's admonition that "[the plaintiff] cannot gain the exclusive right to produce [items using a functional design] by asserting that consumers associate it with the look of the invention itself." *See TrafFix,* 532 U.S. at 35, 121 S.Ct. 1255.

Consumer surveys are regarded as the only direct evidence of secondary meaning. *See, e.g., Yankee Candle,* 259 F.3d at 43 & n. 12. In this case, Straumann has produced a consumer survey conducted by John Bunge in support of its position that its implant has acquired secondary meaning. *See* Declaration of John A. Bunge, Docket No. 142 ("Bunge Decl."); Declaration of John R. Hauser, Docket No. 126 ("Hauser Decl."). That survey does not support Straumann's claims.

Of the 146 dental practitioners who responded to the survey, only four identified the rounded bottom as the reason they identified a source of the product, and two out of these identified a manufacturer other than Straumann. *See* Declaration of John R. Hauser, p. 2 § 6. There is no indication that *anyone* identified the upper part of the thread as a feature that indicated the source of the Straumann implant. *Id.* No reasonable jury could infer from identification figures as low as 0 to 2.73 % that consumers identify the non-functional features of Straumann's implant as indicating a single source of origin for the Straumann implant.

Mr. Bunge attempted to salvage his study by explaining, in substance, that customers are not used to distinguishing among implant features, and that references to the "shape of the implant" or "the thread" should not be discounted because they *incorporate* the non-functional elements. Bunge Decl., ¶¶ 5–7. These explanations simply give voice to what is wrong with the study under current law: the study does not filter out the non-functional features from those that are functional to

evaluate which features consumers use to identify the source of the product. Unless it is shown that the non-functional features primarily serve to identify the source of the product in the minds of consumers, the product cannot be protected as one that has acquired secondary meaning. *See, I.P. Lund.*, 163 F.3d at 42; *Textron,* 753 F.2d at 1027.

The survey also shows that 40 % of respondents either (a) recognize the source/brand of the implant to be Straumann or (b) perceive the manufacturer of the implant shown to them to be associated with Straumann. That 40%, however, reflects the perception of respondents to the Straumann implant *overall.* Bunge Decl., p. 2 ¶ 3. This evidence might be relevant to a claim of secondary meaning as to the *overall* design of the implant, but, I have determined, as discussed above, that the evidence is insufficient to create a triable issue that the overall design is non-functional. Thus, the 40% recognition factor is of no relevance to the question of whether the *individual* features of the Straumann implant have achieved secondary meaning. *See Textron,* 753 F.2d at 1027 (when most features and the overall design itself are functional, the evidence must show that the individual, non-functional features have acquired secondary meaning).

■ Straumann's study on secondary meaning also suffers from an additional flaw which would lead me to exclude it from the jury's consideration. The initial questions asked of the respondents were: *"What company* do you think puts out these products? If you do not know, please feel free to say so." (emphasis added). Bunge Decl., Exh. A at 4 ¶ H. These questions presume the existence of the key element in a secondary meaning inquiry, namely the association of the design with a *single* source. *See I.P. Lund,* 118 F.Supp.2d at 107 n. 24 (similar use of a

question presuming that the products came from a single source prevents the study from providing a reliable measure of consumer association, much less a measure of whether the feature is seen by consumers as "primarily" assessing origin). Only respondents who *did not* initially perceive a source were asked: "Do you associate those products with any particular brand name?" Bunge Decl. at ¶ I.. Hence, the Bunge study would not be helpful to a jury attempting to determine whether consumers associate the product features at issue with a single manufacturer, because the survey suggested to the respondents that the products *did* come from a single manufacturer. *See* Fed.R.Evid. 702 (expert testimony to be admissible must assist the jury and be the "product of reliable principles and methods"); ·*see also I.P. Lund,* 118 F.Supp.2d at 107 n. 24.

■ Straumann has also presented what it describes as circumstantial evidence that the individual features of its implant have acquired secondary meaning. But the circumstantial evidence of secondary meaning also falls short of the mark. Circumstantial evidence of secondary meaning includes, but is not limited to, the length and manner of use of the trade dress, the nature and extent of advertising and promotion of the trade dress, the product's established place in the market, and any proof of intentional copying. *See Yankee Candle,* 259 F.3d at 43–44.

Before turning to the record before me, with respect to application of these factors to the Straumann implant, a related issue must be addressed. Straumann attempts to use purported evidence of actual confusion to show the existence of secondary meaning. Its evidence includes the Hollander confusion survey, which purported to have "assess[ed] the likelihood of confusion between the overall shape, design and appearance of the Lifecore and Straumann

implants" by having presented to dental practitioners various representations of both manufacturers' implants outside of their packaging. *See* Straumann Rule 56.1 Statement ¶¶ 132–141. The survey also includes a series of affidavits by dental practitioners purporting to describe incidents of confusion between Straumann and Lifecore implants taken out of their respective packages. *See* Straumann Rule 56.1 Statement, ¶¶ 110s. Assuming for purposes of the argument that this evidence indeed shows actual confusion, it does not assist Straumann because the study does not show that consumers identify the source of the implants by their respective non-functional features, as opposed to their overall design. *See, e.g., Textron,* 753 F.2d at 1027.

■■■■ I turn now to the analysis of the other circumstantial evidence of secondary meaning proffered by Straumann.

First, Straumann points out that it had been using its mark for nine and a half years before Lifecore introduced its implant on the market. Straumann's Rule 56.1 Statement ¶¶ 68A–68C. There appears to be no dispute on this point. But while this factor favors Straumann, standing alone, it is insufficient to establish secondary meaning. *See generally Yankee Candle,* 259 F.3d 25 (granting summary judgment on the basis of lack of evidence of secondary meaning, despite the fact that the plaintiff had used the mark for an extended period of time).

Second, Straumann has provided evidence of its advertising and marketing expenses. *See* Straumann Local Rule 56.1 Statement, ¶ 68H (stating that Straumann spent about $ 12.1 million advertising its implant). However, there is no evidence of so-called "look for" advertising (advertising that encourages consumers to look for particular features as indicative of origin) regarding the two presumably non-

functional features, that is, the rounded bottom and the upper part of the thread. *See Yankee Candle,* 259 F.3d at 44–45. Advertising and marketing expenses are truly probative of secondary meaning only when they encourage consumers to make the connection between a product feature and the origin of the product, i.e. when a manufacturer's promotion of its device tells consumers to "look for" a specific feature as indicative of source. *Id.* at 45; *see also Euro Pro Corporation v. Tristar Products, Inc.,* 172 F.Supp.2d 567, 574 (D.N.J.2001) (citations omitted) (same). Simply "featuring" the relevant aspects of the product in one's advertising, as Straumann has done, is insufficient. *See Yankee Candle.,* 259 F.3d at 44. Hence, application of the advertising/marketing factor does not favor Straumann.

Third, Straumann argues that its sales volume (almost 300,000 units sold between 1991 and 2002) constitutes evidence of secondary meaning. *See* Straumann Local Rule 56.1 Statement, ¶ 68D. While somewhat helpful to Straumann, the significance of this evidence is attenuated because "the successful sales [of the product] may be because consumers desire the product itself, rather than because consumers identify the source and care about who the source is." *Euro Pro Corporation,* 172 F.Supp.2d at 574. In addition, as with the evidence of actual confusion, there is nothing that ties the evidence of sales to any evidence that consumers identify the source of the Straumann implant by recognition of the two non-functional features as indicative of origin.

Finally, Straumann has pointed to some of Lifecore's internal documents which, Straumann asserts, indicate that Lifecore copied the product's design. *See, e.g.,* Straumann Rule 56.1 Statement, ¶ 68.K. Intent to copy plays a negligible role in a product *design* case, *see Yankee Candle,*

259 F.3d at 45, because "the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product." *Duraco v. Joy Plastic Enterprises*, 40 F.3d 1431, 1453 (3rd Cir.1994). In addition, in the product design context "in many instances there is no prohibition against copying goods and products," and "[a]llowing competitors to copy will have salutary effects in many instances." *Traf-Fix*, 532 U.S. at 29, 121 S.Ct. 1255.

Looking at the evidence as a whole, the only factor that clearly favors Straumann is the length of use of its mark, now over ten years. The volume of Straumann's sales of its implant might have been helpful had Straumann been able to show that these sales occurred because consumers identified non-functional features of the implant with the origin of the implant. Neither the purported evidence of actual confusion nor the evidence of Straumann's advertising of its implant adds any real weight to Straumann's cases. The same can be said of the evidence concerning intent by Lifecore to copy features of the Straumann implant. The real problem for Straumann, in the end, is that none of its evidence bears on the precise issue of whether the rounded bottom and the upper part of the thread (as distinguished from the overall design) have acquired secondary meaning. With only length of use of the Straumann implant strongly favoring a finding of secondary meaning, Straumann cannot make the required "vigorous showing" that the non-functional features of its implant have acquired secondary meaning. *See Yankee Candle*, 259 F.3d at 43 & n. 14. In deciding that Straumann's evidence is, on balance, insufficient to defeat summary judgment, I emphasize that "[g]iven the highly functional nature of certain elements of [the plaintiff's] claimed combination trade dress, ... the concern that protection could prevent healthy competition weighs heavily in this case." *Id.*

at 45. Lifecore is therefore entitled to summary judgment as against Straumann's trade dress claim for the rounded bottom and upper part of the thread of the Straumann implant.

Because Straumann has not established as trialworthy its claim that the overall design of the Straumann implant is non-functional or its claim that the arguably non-functional features of its implant have acquired secondary meaning, summary judgment is proper as to the Lanham Act claim.

 The state law trademark and unfair competition claims are indistinguishable from the Lanham Act claim and will also be dismissed. *See Yankee Candle Co., Inc., v. The Bridgewater Candle Co., Inc.*, 99 F.Supp.2d 140, 156–57 (D.Mass.2000). In addition, I note that the nexus with Massachusetts is insufficient to sustain Straumann's claim under Mass. Gen. Laws ch. 93A § 11, *see, e.g., M & I Heat Transfer Prods. Ltd. v. Gorchev*, 141 F.3d 21, 23–24 (1st Cir.1998). Here, only 2.3 % of Lifecore's sales occurred within Massachusetts. Declaration of Mr. Swenson ¶ 12. Thus Straumann cannot show that any alleged act of unfair competition occurred "primarily and substantially in Massachusetts." See Mass. Gen. Laws ch. 93A § 11. Summary judgment will also be GRANTED as to the state claims.

Based on the foregoing, there is no need to address defendant's motion to strike.

For the reasons stated above, defendant's motion for summary judgment is hereby GRANTED as to all counts of the complaint. Defendant's motion to strike is hereby DENIED AS MOOT. Judgment shall enter for the defendant.

IT IS SO ORDERED.