**SHELL TRADEMARK MANAGE-MENT B.V. and Shell Oil Company, Plaintiffs,**

v.

**WARREN UNILUBE, INC. and Warren Oil Company, Inc., Defendants.**

Civil Action No. H–09–2851.

United States District Court,
S.D. Texas,
Houston Division.

Jan. 10, 2011.

887

Griffith B. Price, Jr., Finnegan Henderson et al., Washington, DC, Bruce James Cannon, Michael O. Sutton, Naresh

Kilaru, Paul C. Van Slyke, Locke Lord Bissell and Liddell LLP, Houston, TX, for Plaintiffs.

Sarah M. Johnson, Benjamin N. Thompson, Wyrick Robbins Yates & Ponton LLP, Lee M. Whitman, Wyrick Robbins LLP, Raleigh, NC, David Philip Whittlesey, Andrews Kurth LLP, Austin, TX, for Defendants.

### *MEMORANDUM AND ORDER* [1]

KEITH P. ELLISON, District Judge.

Pending before the Court are the following motions:

— Motion to Exclude Testimony and Report of Dr. Linda L. Golden (Doc. No. 60) filed by Defendants Warren Unilube, Inc. and Warren Oil Company, Inc.;

— Defendants' Motion for Summary Judgment (Doc. No. 61).; and

— Plaintiffs' Motion for Summary Judgment on Nonfunctionality and Inherent Distinctiveness of its Rotella Trade Dress (Doc. No. 58).[2]

Having considered the parties' filings and the applicable law, the Court finds that Defendants' Motion to Exclude should be denied; that Defendants' Motion for Summary Judgment should be granted in part and denied in part; and that Plaintiffs' Motion for Summary Judgment should be denied.

### I. BACKGROUND

■ Plaintiff Shell Oil Company manufactures and sells a 15W–40 motor oil product known as ROTELLA. Plaintiff Shell Trademark Management B.V. owns the trade dress [3] that appears on the RO-

---

1. At the request of Plaintiffs, this order has been amended from the original by redacting three pieces of information on pages 21 and 24.

2. The Court will issue a subsequent order ruling on Plaintiffs' Motion to Exclude the

Reports and Testimony of Defendants' Proposed Expert Michael A. Paschall (Doc. No. 59).

3. "Trade dress" refers to either the packaging or the design of a product. *Wal–Mart Stores,*

TELLA product, though it is not registered, nor is the bottle patented. Defendant Warren Unilube, Inc. manufactures and sells a 15W–40 motor oil product known as LUBRIGUARD. Defendant Warren Oil Company, Inc. advertises, promotes, and sells LUBRIGUARD. Plaintiffs (collectively, "Shell") allege that Defendants' (collectively, "Warren") LUBRIGUARD product infringes ROTELLA's trade dress.

Shell began marketing ROTELLA in a white container with a black cap and blue and yellow label in October 2006. In its First Amended Complaint (Doc. No. 12), Shell depicted a version of the ROTELLA trade dress released in 2007 (Figure 1), the first version to feature two rounded handles. Two additional versions of the ROTELLA trade dress have since been released, including a 2009 version (Figure 2) that is still in use today.

Figure 1

Figure 2

Prior to 2008, Warren sold its 15W–40 motor oil with the brand name "Coastal." In 2008, Warren decided to rebrand the product, and on October 15 of that year introduced "LUBRIGUARD" to the marketplace (Figure 3). In doing so, Warren wanted to compete with Shell by offering a lower-cost alternative to ROTELLA. Shell sent a letter to Warren on December 17, 2008, claiming that LUBRIGUARD infringed the ROTELLA trade dress. In response, Warren voluntarily changed the LUBRIGUARD label beginning in January 2009, changing the gradation of colors into solid colors (Figure 4).

*Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

Figure 3

Figure 4

Shell filed this suit on September 3, 2009, alleging violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Texas common law.

## II. MOTION TO EXCLUDE

### A. Legal Standard

Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise...." "[T]he trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935,

937 (5th Cir.1999). However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir.2009) (citing *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786).

The Federal Judicial Center has set forth seven factors for courts to consider in determining whether survey evidence is sufficiently trustworthy:

— the population was properly chosen and defined;

— the sample chosen was representative of that population;

— the data gathered were accurately reported;

— the data were analyzed in accordance with accepted statistical principles.

— whether the questions asked were clear and not leading;

— whether the survey was conducted by qualified persons following proper interview procedures; and

— whether the process was conducted so as to ensure objectivity (e.g., determine if the survey was conducted in anticipation of litigation and by persons connected with the parties or counsel or by persons aware of its purpose in the litigation).

Manual for Complex Litigation § 11.493 (4th ed. 2004); *see, e.g., Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,* 452 F.Supp.2d 772, 778 (W.D.Mich.2006) (citing Manual for Complex Litigation factors).

■ Flaws in a survey generally bear on weight, not admissibility. As the Ninth Circuit explained, "as long as [it is] conducted according to accepted principles, ... survey evidence should ordinarily be found sufficiently reliable under *Daubert.* Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1143 n. 8 (9th Cir.1997); *see also* Manual for Complex Litigation § 11.493 (4th ed. 2004) ("Even if the court finds deficiencies in the proponent's showing [of foundation], the court may receive the evidence subject to argument going to its weight and probative value."); 6 McCarthy on Trademarks and Unfair Competition (hereinafter "McCarthy") § 32:162 (2010) ("The selection of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility.").

## B. Analysis

Shell has submitted as evidence for the summary judgment motions the Expert Report of Dr. Linda L. Golden, which discusses consumer surveys regarding the secondary meaning of the ROTELLA trade dress and the likelihood of confusion between ROTELLA and LUBRIGUARD. The surveys consisted of interviews at TA TravelCenters of America truck stops in ten states across the U.S. (Expert Report of Dr. Linda L. Golden, Appendix to Doc. No. 60 at A–29 ("Golden Report"), at 3–4.) The interviewers included in the survey people encountered at the truck stops who met all of the following criteria:

— Had not been a participant in a motor oil survey within the prior 12 months;

— Had not worked for a motor oil company, a distributor of motor oil, an auto parts store, or any other store that sells motor oil within the prior five years;

— Had shopped for motor oil for any diesel truck in auto parts stores, truck fuel stops, large retail stores or in other stores in the United States;

— Had purchased motor oil for any diesel truck in the prior six months *and* planned to purchase motor oil for any diesel truck in the next six months;

— In the prior six months had shopped for motor oil or purchased motor oil for any diesel truck in at least one of the following automotive parts stores: AutoZone, Advance Auto Parts or Advance Stores Company, Western Auto, Parts Depot, Dixie Auto Parts, Uni–Select U.S. or Auto Plus or Parts Plus, AutoCase or NAPA AutoCare, or Triple "R" Truck Parts.

(*Id.* at 4.) For the "secondary meaning" survey, 200 interviewees were shown a picture of a ROTELLA bottle or a control bottle and asked, "If you have an opinion, what is the brand of motor oil product in the picture I showed you?" (*Id.* at 5, 11.) A total of 600 interviewees participated in two "likelihood of confusion" surveys, in which they were first shown a photograph of a ROTELLA product or products and then shown pictures of four other motor oil products, including LUBRIGUARD. The

interviewees were then asked several questions about whether they thought any of the "motor oil products" in the latter display were "put out by" the company that puts out the first product, "affiliated or associated with" that company, and whether any of the companies who put out the products "needed to get permission or approval" from that company. (*Id.* at 11–16.) Dr. Golden states in her report that the surveys "conclusively established a high level of secondary meaning among a substantial portion of consumers of heavy-duty motor oil in the marketplace" and "a substantial likelihood of confusion" between ROTELLA and LUBRIGUARD. (*Id.* at 17–18.)

Warren argues that Dr. Golden's testimony regarding Shell's consumer surveys, should be excluded for several reasons. First, the surveys were implemented by Dr. Tom Jukam (who was designated as a "nontestifying witness" in this case), rather than by Dr. Golden herself. Second, Warren contends that the sampling universe was underinclusive because the survey was conducted only at truck stops, although long-haul truck drivers are only part of the market for heavy-duty motor oil. Third, Warren contends that the survey was biased toward ROTELLA users because it focused on *past* rather than *future* purchasers of heavy-duty motor oil and because the truck stops involved all sold ROTELLA but not LUBRIGUARD. Fourth, Warren contends that the phrasing of the survey questions was suggestive and leading. Finally, Warren contends that the survey did not accurately replicate market conditions because it used only photographs of the products and because the control bottle was implausible and not reflective of products on the market today.

With regard to Warren's first argument, the extent of Dr. Golden's delegation to Dr. Jukam is indeed troubling. For example, Dr. Golden testified in her deposition that Dr. Jukam trained the interviewers and visited all of the interview sites, while Dr. Golden did not. (Golden Dep., Sept. 17, 2010, Appendix to Doc. No. 60, at A–237, at 108–18.)[4] Dr. Golden further testified that she did not know which research firms employed the interviewers, suggesting that Dr. Jukam had selected those firms. (*Id.* at 129–31.) As Warren points out, "the absence of any testimony by [those] who were responsible for the various parts of the survey" cuts against the admissibility of survey evidence. *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1205 (S.D.N.Y.1983). However, courts have found that "the overseer of the survey" may testify "without having to present testimony from other persons involved in the details of conducting the survey." *Procter & Gamble Co. v. Colgate–Palmolive Co.*, 1998 WL 788802, at *82 (S.D.N.Y. Nov. 9, 1998); *see also Piper Aircraft Corp. v. Wag–Aero, Inc.*, 741 F.2d 925, 931 (7th Cir.1984) ("We agree with the suggestion in McCarthy's treatise that the testimony of a survey director alone can establish the foundation for the admission of survey results."); *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir.1988) ("The testimony of the survey director alone is sufficient to establish a foundation."). For example, in *Franklin Resources, Inc. v. Franklin Credit Mgmt. Corp.*, the Court found sufficient foundation based on the report of an experienced market researcher who "designed the methodology and technique to be used in the study, wrote the questionnaire, selected the advertisements and letters to be used, and devised instructions for the interviewers," although interview-

---

**4.** Dr. Golden refers to Dr. Jukam in her report as the "overall project survey research director." (Golden Report at 10.)

ing was conducted by a separate firm and administered by various firms, and the researcher lacked personal knowledge of the manner in which the interviews were actually conducted. 1997 WL 543086, at *7–8 (S.D.N.Y. Sept.4, 1997).[5]

In this case, Dr. Golden was "was sufficiently involved in the survey for [her] foundation testimony to establish its trustworthiness." *Chase Fed. Sav. and Loan Ass'n v. Chase Manhattan Fin. Serv. Inc.*, 681 F.Supp. 771, 780 (S.D.Fla.1987) ("member of the public relations firm that conducted the survey, . . . [w]hile not the survey director, . . . was sufficiently involved in the survey for his foundation testimony to establish its trustworthiness"). Dr. Golden, who has forty years of experience and extensive credentials in the field of survey and market research, designed the methodology for the surveys, including the universe and the questions. (Golden Report at 1–4.) She worked closely with Dr. Jukam, both in the past and for these surveys specifically, to design the training of interviewers. (Golden Dep., at 116–118.) Dr. Golden also reviewed all of the questionnaires multiple times after the surveys were conducted. (*Id.* at 112.) Unlike in *Toys R Us*, 559 F.Supp. 1189, the Court finds in this case sufficient indicia of trustworthiness based on the methodology of the surveys and Dr. Golden's personal involvement. *See Procter & Gamble*, 1998 WL 788802, at *82 (distinguishing *Toys R Us* because it "involved serious questions about the conduct of the survey . . . which made the absence of testimony from additional persons unusually problematic"); Manual for Complex Litigation § 11.493 (4th ed. 2004) (deficiencies in foundational evidence for

surveys can go to weight rather than admissibility). Therefore, Dr. Golden's report is admissible at this stage of the case. However, the lack of a witness with personal knowledge of, among other things, how the interviewer trainings and the interviews themselves were actually conducted, reduces the trustworthiness of the survey and thus limits the weight that the Court will accord it.

■ Likewise, Warren's objections to the methodology of the surveys reduce the weight to which Dr. Golden's report will be given, but do not render it inadmissible. Warren points to several ways in which the surveys could have been conducted more reliably. First, the universe of participants is somewhat underinclusive because it was targeted more at long-haul truck drivers than at other users of heavy-duty motor oil. Warren cites to Shell documents indicating that 50% of the relevant market of heavy-duty motor oil is "Class 2C trucks, which are pickup trucks and commercial vans under 10,000 pounds," and that users of construction and agricultural equipment also constitute a portion of the market. (Doc. No. 60, at 7.) The Court agrees that Shell has not demonstrated that the use of truck stops captured these other categories of heavy-duty motor oil consumers, notwithstanding Shell's bare assertions in its response brief that such consumers "are also found at truck stops." (Doc. No. 66, at 14; *see* 6 McCarthy § 32:159 ("the burden is on the proponent of the survey to show that the sampling of the universe conforms with recognized statistical standards") (citing Manual for Complex Litigation § 21.493 (3d ed. 1995.))) However, an imperfect universe

---

**5.** Moreover, in *Franklin Resources*, the researcher who wrote the report could not identify "the exact locations or dates of the interviews in each city, . . . the qualifications or training of the interviewers, . . . and even the name of the interviewing companies used in each city" and "had only a vague recollection of the validation process performed by" the firm that conducted the interviews. *Id.* at *7.

is not fatal to the surveys' admissibility. 6 McCarthy § 32:162 ("Even if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which is was intended."); *see also id.* (use of inappropriate universe generally affects weight, not admissibility). The Court finds that, while not optimal, the universe surveyed here remains to some degree probative of the views of consumers of heavy-duty motor oils.[6]

Second, the secondary meaning survey question, "If you have an opinion, what is the brand of motor oil product in the picture I showed you?" is somewhat leading. A better phrasing of the question would have been "what is the brand or brands ..." or "what company or companies puts out this product?" *See Straumann Co. v. Lifecore Biomedical Inc.,* 278 F.Supp.2d 130, 138 (D.Mass.2003) (" 'What company do you think puts out these products? If you do not know, please feel free to say so' ... presume[s] the existence of the key element in a secondary meaning inquiry, namely the association of the design with a single source."). However, other courts have found such questions not to be lead-

ing. *See, e.g., Essie Cosmetics, Ltd. v. Dae Do Intern., Ltd.,* 808 F.Supp. 952, 960 (E.D.N.Y.1992) (citing cases). In the context of product *packaging,* which "almost *automatically* tell[s] a customer that [it] refer[s] to a brand ... and immediately signal[s] a brand or a product source" *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 212–213, 120 S.Ct. 1339, 146 L.Ed.2d 182 (emphasis in original) (internal citations omitted), the Court finds that this question phrasing is only slightly leading. The best remedy, the Court concludes, is to give slightly less weight to the survey as a result of this phrasing.[7]

Finally, the Court does not find the survey evidence inadmissible based on failure to replicate market conditions. Although the interviewees were shown photographs of the products, whereas in a store they would see three-dimensional bottles, that method is commonly used and accepted. *See, e.g., Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 507 (5th Cir.1980) (using photographs in likelihood of confusion survey about gas station signs). The Court does find the control bottle used in the secondary meaning survey to be slightly problematic, but not enough so to warrant exclusion. As a

---

**6.** The Court is unconvinced by Warren's arguments that the screening questions focused on past purchasers rather than prospective future purchasers. *See* 6 McCarthy § 32:161 (criticizing as "extraordinarily myopic" exclusion of survey because universe consisted of past, rather than future, purchasers of jeans) (citing *Jordache Enterprises Inc. v. Levi Strauss Co.,* 841 F.Supp. 506, 518 (S.D.N.Y. 1993)). Furthermore, although no inquiry was made about planned future purchases at the specific auto parts stores, the interviewees *were* limited to those who "planned to purchase motor oil for any diesel truck in the next six months." (Golden Report at 4.) The Court is also unconvinced by Warren's argument that the universe was skewed toward ROTELLA users because the truck stops did not carry LUBRIGUARD. The screening questions ensured that interviewees had

shopped for or purchased motor oil at an auto parts store that carries both products, *id.,* so it is unlikely that the presence of only ROTELLA at the truck stop would have any more than a marginal skewing effect on the makeup of the sample.

**7.** The Court is also unconvinced by Warren's contention that the survey was suggestive because the interviewers stated prior to the questioning that the survey was "about motor oils" or "heavy duty motor oils." (*See* Doc. No. 60, at 9.) Such preliminary mention of the topic was necessary to all of the screening questions in order to obtain a proper sample for the surveys. *See* 6 McCarthy § 32:174 (discussing "now-standard survey format" that used "[s]creening question to eliminate persons in the [relevant] industries" from the sample).

control, the interviewers showed an "F-style bottle" with a single handle—the sort frequently used several years ago in the industry but less often today—that had been painted all brown, with the label fully blacked-out. (Golden Report, at 5.) "The control question ... should use a mark similar enough to the actual mark that it provides an accurate measure of the confusion created." 6 McCarthy § 32:187. The Court agrees with Warren that the control bottle could have been more similar to the ROTELLA bottle to obtain a more accurate measure of confusion. Notwithstanding Shell's argument in its response that many features must be changed in order to avoid false "noise,"[8] the Court is troubled that the control chosen seems to share virtually *no* features with the ROTELLA bottle besides the basic fact that they are motor-oil bottles. However, this again goes to weight, not admissibility, and the Court finds that the control used lessens only slightly the probative value of the surveys.

Accordingly, the Court denies Warren's Motion to Strike the Testimony of Dr. Linda Golden, but will the flaws in the survey's foundation and methodology in weighing the evidence.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard for Summary Judgment

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. Fed.R.Civ.P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir.2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the nonmoving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir.2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed. R.Civ.P. 56(e)(1); *see, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996); *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir.2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### B. Legal Standard for Trade Dress Infringement Claims

█ Section 43(a) of the Lanham Act provides in relevant part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

---

**8.** "Noise" refers to responses in a survey that are not probative and must be filtered out to obtain an accurate assessment. *See* 6 McCarthy § 32:187. For example, there may be interviewees who are generally confused, "bored, hurried or just plain contrary...." *Id.*

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). To prove infringement of a trade dress, a plaintiff must show 1) that the dress is protectable; and 2) that infringement has occurred. *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 (5th Cir.1984), *abrogated on other grounds by TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). "The plaintiff has the burden of proof on both of these issues." *CICCorp., Inc. v. AIMTech Corp.*, 32 F.Supp.2d 425, 434 (S.D.Tex. 1998).

 To be protectable—the first prong—the trade dress must be nonfunctional and either be inherently distinctive or have secondary meaning. *Wal–Mart*, 529 U.S. at 210, 120 S.Ct. 1339. In this case, the parties agree that the Rotella trade dress is nonfunctional, so that Court need not address that prong. To be "inherently distinctive," a trade dress's "intrinsic nature" must "serve[ ] to identify a particular source." *Id.* (internal quotation marks omitted). The Supreme Court has held that a product's packaging—unlike the design of a product itself—"almost *automatically* tell[s] a customer that [it] refer[s] to a brand ... and immediately ... signal[s] a brand or a product 'source.' " *Wal–Mart*, 529 U.S. at 212, 120 S.Ct. 1339 (emphasis in original) (internal citations

and ellipses omitted). However, "where it is not reasonable to assume consumer predisposition to take ... packaging as indication of source[,] ... inherent distinctiveness will not be found." *Id.* at 213, 120 S.Ct. 1339. Applying the standard set forth in *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342 (C.C.P.A.1978), courts, including the Fifth Circuit, consider a number of factors in inquiring whether a trade dress is "inherently distinctive", including:

> [W]hether it was a "common" basic shape or design, whether it was unique or unusual in a particular field, whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, whether it was capable of creating a commercial impression distinct from the accompanying words.

*Id.* at 1344 (citations omitted); *see Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 240–47 (5th Cir.2010) (applying Seabrook factors in "inherently distinctive" inquiry). "[T]he Seabrook Foods factors are variations on a theme rather than discrete inquiries." *Id.* at 244.

 With regard to "secondary meaning," courts inquire into "the public's mental association between the mark and the alleged mark holder" to determine whether "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Bd. of Supervisors for La. State Univ. Agric. and Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir.2008) (citing *Wal–Mart*, 529 U.S. at 211, 120 S.Ct. 1339). Courts in the Fifth Circuit consider a combination of a number of factors in this inquiry, including:

(1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

*Pebble Beach, Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 543 (5th Cir.1998), *abrogated on other grounds by TrafFix Devices*, 532 U.S. 23, 121 S.Ct. 1255. "Whether a mark is inherently distinctive and whether it has acquired secondary meaning are questions of fact." *Amazing Spaces*, 608 F.3d at 234.

■■■ The second prong, infringement, occurs where "the use creates a likelihood of confusion as to the 'source, affiliation, or sponsorship'" of the alleged infringer's product. *Pebble Beach*, 155 F.3d at 543 (citing 15 U.S.C. § 1125(a)(1)(A)). " 'Likelihood of confusion' means more than a mere possibility; the plaintiff must demonstrate a probability of confusion." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir.2009). Courts "examine the following nonexhaustive 'digits of confusion' in evaluating likelihood of confusion: (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers." *Id.* at 227. "No digit is dispositive, and the digits may weigh differently from case to case, depending on the particular facts and circumstances involved." *Id.* (quotation marks omitted). "[L]ikelihood of confusion is typically a question of fact." *Id.*

## C. Analysis

Shell moves for summary judgment that the ROTELLA trade dress is inherently distinctive.[9] Warren moves for summary judgment that the trade dress is not inherently distinctive, that is does not have secondary meaning, and that there is no likelihood of confusion between the ROTELLA trade dress and the LUBRIGUARD trade dress. Warren also moves for summary judgment on Shell's common law claims for trade dress infringement / unfair competition, misappropriation, and conspiracy.

### 1. Inherent Distinctiveness

■■■ Shell argues that the ROTELLA trade dress is inherently distinctive because 1) courts have held that product packaging is generally inherently distinctive; 2) under the *Seabrook* test, ROTELLA's packaging is unique, and significantly different from its competitors; and 3) responses given in Shell's secondary meaning survey show that many consumers identify the trade dress with ROTELLA. Warren contends that ROTELLA trade dress is *not* inherently distinctive because 1) it is not unique or unusual in the motor oil industry, as evidenced by the designs of various other companies' bottles; 2) Shell's consumer survey shows that many consumers could not identify the bottle as ROTELLA; and 3) Shell has changed the ROTELLA bottle several times since October 2006, so it does not have a stable or consistent look.

■■■ As a preliminary matter, Warren argues that Shell is not entitled to protection because it has not consistently used the same ROTELLA bottle over time. *See Al–Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1329 (Fed.Cir.1999) ("Constant-

---

9. Shell also moves for summary judgment of nonfunctionality of the ROTELLA trade dress, but Warren does not contend that the trade dress is functional. (Doc. No. 63, at 1.) Accordingly, the Court need not address the issue of functionality.

ly changing styles rarely demonstrate the stability necessary for the public to identify those particular characteristics with a particular source."). As the Third Circuit held, a series of products may enjoy trade dress rights so long as it has a "consistent overall look." *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir.2000). The products or packaging need not be "identical," and there may be "slight variations in [the] package design so long as the change does not alter the distinctive characteristics and the trade dress conveys a single and continuing commercial expression." *Id.* Shell has changed the ROTELLA bottle several times since 2006. (*See* Plaintiffs' Amended Interrogatory Response, Doc. No. 62–7, at 2.)[10] However, the Court finds that there is a great deal of similarity between the versions of RO- TELLA introduced in September 2007 (Figure 1, above) and October 2009 (Figure 2, above). (*See* Doc. No. 70, at 5–8.) Moreover, Shell stated in its interrogatory response that the October 2009 version is still in use today (along with the June 2010 version). (*Id.*) Accordingly, for purposes of this case, the Court will treat as the "ROTELLA trade dress" the commonalities between the September 2007 ROTEL- LA bottle (which was depicted in the First Amended Complaint) and the October 2009 ROTELLA bottle (which is currently used).[11] Furthermore, the Court will only consider the potential infringement of the January 2009 version of LUBRIGUARD (Figure 4, above) rather than the October 2008 version (Figure 3, above), as only the latter version was cited in the First Amended Complaint, and there is no indication that the former version is still being sold.

The Court finds that genuine issues of material fact remain on the issue of inherent distinctiveness, and so the question should go to the jury. The Supreme Court and the Fifth Circuit have recognized that product packaging has a tendency to be inherently distinctive. *Wal–Mart*, 529 U.S. at 212, 120 S.Ct. 1339; *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 702–03 (5th Cir.1981) (noting that "the possible varieties of advertising display and packaging are virtually endless"); *Sicilia Di R. Biebow & Co.* 732 F.2d at 426 n. 7 ("The wide range of available packaging and design options allows a producer to appropriate a distinctive identity without unduly hindering his competitors' ability to compete."); *see also Regal Jewelry Co., Inc. v. Kingsbridge Intern., Inc.*, 999 F.Supp. 477, 489 (S.D.N.Y.1998) (noting "tendency for trade dresses to be inherently distinctive because the whole universe of materials and designs is available for packaging"). However, there is no bright-line rule that packaging is *always* inherently distinctive, and the threshold question remains whether its "intrinsic nature serves to identify a particular source." *Wal–Mart*, 529 U.S. at 210, 120 S.Ct. 1339.

Applying the *Seabrook* factors, a reasonable jury could find either that the trade dress identifies the product as ROTELLA or that it does not. Warren submitted to the Court many pages of exhibits showing motor oils that Warren claims have similar packaging to that of ROTELLA. It is true that other motor oils contain individual features of the ROTELLA bottle, such as the general shape, dual handles, white body, black cap, and use of one or more of the colors blue, yellow, orange, white, and

---

**10.** Specifically, Shell introduced new bottles in October 2006, September 20207, October 2009, and June 2010. *Id.*

**11.** Thus, similarities between LUBRIGUARD and a feature of only one of those ROTELLA bottles (such as the presence of a solid yellow field below the brand name) are not relevant to the infringement inquiry.

black on the label. (*See* Pl.'s Dep. Ex. 222.) It is also true, however, that no other motor oil contains the exact combination of features of the ROTELLA bottle. A jury in this case could reasonably find that the ROTELLA bottle is either "common" or "unique"; either "a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods" or not; and either "capable of creating a commercial impression distinct from the accompanying words" or not. *See Seabrook*, 568 F.2d at 1344. "[T]he question of inherent distinctiveness almost always involves heavily disputed facts and so is not ordinarily amenable to summary judgment." *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 377 (4th Cir.1999); *see also id.* ("concept of distinctiveness is an intuitive one ... and heavily fact-dependent") (citations omitted). Accordingly, given that there are disputed factual questions that could reasonably lead to either outcome, the Court finds it appropriate for the jury to decide this question.[12]

### 2. Secondary Meaning

 Even if nonfunctional trade dress is not inherently distinctive, it is protectable under the Lanham Act if it has acquired "secondary meaning." Shell argues that, at a minimum, genuine issues of material fact remain on this question because 1) Shell's consumer surveys demonstrate secondary meaning; 2) Warren had the intent to copy the ROTELLA trade dress; 3) ROTELLA has a large share of the heavy-duty motor oil market; and 4) Shell has spent millions of dollars advertising ROTELLA in recent years, including advertisements specifically focusing on the packaging design at issue in this case.

Warren argues that summary judgment of no secondary meaning is appropriate because 1) Shell has changed the ROTELLA trade dress several times in the past four years; 2) Shell's advertising for ROTELLA has not been focused on the trade dress at issue; 3) there is no evidence that Warren intentionally copied ROTELLA; and 4) considering the relevant factors as a whole, Shell has not demonstrated secondary meaning. The Court finds that genuine issues of material fact remain with regard to whether the ROTELLA trade dress has acquired secondary meaning.

First, although, as discussed above, the surveys were flawed in several ways, the results remain somewhat probative of secondary meaning. 74% of the participants identified the ROTELLA bottle as "ROTELLA" and/or "Shell," which, after factoring out "noise," yielded an identification rate of 54.5%. (Golden Report, at 11.) Such a rate is in the range that is generally considered to prove secondary meaning. *See* 6 McCarthy § 32:190 ("Generally, figures over 50% are regarded as clearly sufficient.") (citing cases). Even discounting for the flaws with the survey, the 54.5% identification rate is sufficient to create a genuine issue of material fact. *Cf. Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 295 (7th Cir.1998) (while not establishing secondary meaning, 30% rate was "still probative of the issue" and "raised material questions of fact"); *see also* 6 McCarthy § 32:162 ("Even if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which is was intended.").

---

12. The Court is unconvinced by the individual survey responses Shell points to as "corroborating evidence of inherent distinctiveness." (*See* Doc. No. 58, at 23 & n. 13.) It is also unconvinced by Warren's argument that the number of survey respondents who did not identify the bottle as Shell or ROTELLA demonstrates that it is not inherently distinctive. (*See* Doc. No. 63, at 13–15.)

Other evidence also raises factual issues on the existence of secondary meaning. Among other statements, Warren told the LUBRIGUARD bottle designer "that it was looking to create a bottle that was similar to the Rotella® bottle," though it wanted to improve upon the grip and handle of that bottle, and that the "dual handle jug should match the Rotella T Jug," adding, "Please make it match." (Doc. No. 58, at 7–8.) Although these and the other statements cited by Shell do not conclusively establish that Warren intentionally copied ROTELLA, they do tend to prove secondary meaning. *See Berg v. Symons,* 393 F.Supp.2d 525, 554 (S.D.Tex.2005) ("Courts have recognized that "evidence of intentional copying shows the strong secondary meaning of [a product] because 'there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'"") (citing *Esercizio v. Roberts,* 944 F.2d 1235, 1239 (6th Cir.1991)). Shell also presents evidence that ROTELLA had net sales of **[REDACTED]** during the first year using the new dual-handle container, and that it spent **[REDACTED]** in advertising and promotion.[13]

Considering all of the factors relevant to secondary meaning, the Court finds that factual issues remain. A reasonable jury could find that ROTELLA has acquired secondary meaning, so summary judgment is inappropriate.

### 3. Likelihood of Confusion

■ Warren contends that Shell has produced insufficient evidence to raise a factual issue as to whether there is a likelihood of confusion between ROTELLA and LUBRIGUARD. The Court disagrees, and finds that a reasonable jury could find a likelihood of confusion between the trade dress of the two products.

First, the two products share a number of features, and appear very similar. Each features, among other things, a white body; a black cap; dual handles in a "crescent" shape; grooves inside the handles; a label colored primarily blue and yellow; and a white stripe horizontal slightly over one inch high approximately one-third of the way down the label, featuring the brand name in black capital letters. Warren argues that the prominent display of the brand name, and the Shell logo, on the bottles, eliminates any possibility of confusion caused by the other similarities. In particular, Warren argues that "the presence of well-known brands on a trade dress 'significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products.'" (Doc. No. 70, at 9 (citing *Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 46 (2d Cir.2000)).)

■ The Court disagrees with the suggestion that the presence of the name "ROTELLA" on the bottle eliminates any risk of confusion. *Nabisco* addressed the trade*mark* rather than trade dress context, and did not purport to create a bright-line rule. *See also Sunbeam Products, Inc. v. West Bend Co.,* 123 F.3d 246, 259 (5th Cir.1997), *abrogated on other grounds by TrafFix Devices,* 532 U.S. 23, 121 S.Ct. 1255 ("While we have recognized that labels may dispel consumer confusion, under appropriate circumstances, ... we have also observed that the mere labeling of a product will not automatically alleviate a likelihood of confusion, and the ultimate determination of consumer confusion is a question of fact ....") (citation omitted).

---

**13.** Warren argues in its reply brief that the advertising focusing on the packaging specifically should not be considered because it was released after this lawsuit was filed. (Doc. No. 70, at 6–7.) The Court need not decide that question, as genuine issues of material fact remain even when that advertising is not considered.

Other cases cited by the parties make clear that courts should look at all relevant factors in determining if there is a likelihood of confusion, even where a prominent brand-name is featured on a trade dress. In *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, for example, the court found that the two trade dresses at issue did not "create the same general overall impression" because "by far the most prominent feature" on the boxes were the trade names "Excedrin" and "Tylenol." 973 F.2d 1033, 1045 (2d Cir.1992). As Shell points out in its response brief, the product names in *Bristol–Myers Squibb* covered up nearly half of the overall package. (Doc. No. 65, at 20–21.) Moreover, that court noted:

> We do not mean to intimate that the distinctive elements of any trade dress may be freely appropriated as long as the junior user clearly identifies the source of the goods.... In other cases the trade name may be a less dominant feature of the entire trade dress and thus have less force in countering other similarities between two trade dresses.

973 F.2d at 1047. Other courts have found that, where brand names were less prominent than in *Bristol–Myers Squibb*, a likelihood of confusion remained. *See, e.g., Keds Corp. v. Renee Intern. Trading Corp.*, 888 F.2d 215, 222–23 (1st Cir.1989) ("sneaker labels, where the impressed words can only be read a few feet away from the eyes" insufficient to eliminate likelihood of confusion); *Fruit–Ices Corp. v. Coolbrands Intern., Inc.*, 335 F.Supp.2d 412, 424–26 (S.D.N.Y.2004) (presence of "FrozFruit" and "Fruit–A–Freeze" names insufficient to eliminate likelihood of confusion where packages shared numerous other features). As the Fifth Circuit has stated, "Even if close examination would differentiate the products, that is not sufficient to dispel the initial confusing similarity." *Chevron*, 659 F.2d at 704 (5th Cir. 1981). In addition, even if the names eliminated a risk that consumers would think the two products were the same, there could still be a risk that they would be led to believe that LUBRIGUARD was associated with Shell. *See Keds*, 888 F.2d at 222 (argument that label resolves risk of confusion "fails to address the possibility that individuals might assume that Apples were made by Keds").

In this case, the ROTELLA and LUBRIGUARD names are displayed much less prominently than the "Tylenol" and "Excedrin" names in *Bristol–Myers Squibb*. Moreover, there is a great deal of "similarity in the overall trade dress of the products." *Chevron*, 659 F.2d at 704. A reasonable jury could that the product names are so prominent that there is no likelihood of confusion, or it could find that the overall appearance make the probability of confusion quite high.[14]

Other factors also weigh against a finding of summary judgment of no likelihood of confusion. With regard to the first factor—the type of trademark—the Court finds that the ROTELLA trade dress is at least fairly strong. Whether or not it is "distinctive" in the legal sense, the packaging is different in certain ways from any other heavy-duty motor oil on the market, with the possible exception of LUBRIGUARD. Furthermore, ROTELLA had

---

**14.** Warren also argues that the presence of the Shell logo, "one of the most recognized brands in the *world*," eliminates the likelihood of confusion. (Doc. No. 70, at 9 (emphasis in original).) However, the Court does not find this any more persuasive, as the Shell logo is so small that it cannot be described as anywhere near "prominent" on the bottle.

*See Bristol–Myers Squibb*, 973 F.2d at 1045; *see also* 4 McCarthy § 23:43 ("[A] junior user cannot justify its confusing use of another's mark simply by tacking on its own house mark or tradename. Such a usage may merely suggest to customers that plaintiff has licensed defendant or that the parties are affiliated in some other way.")

(as of mid–2008) **[REDACTED]** share of the heavy-duty motor oil market.[15] The strength of the trade dress weighs in favor of a finding of likelihood of confusion. *See Sun Banks of Florida, Inc. v. Sun Fed. Sav. and Loan Ass'n,* 651 F.2d 311, 315 (5th Cir.1981) (strong marks are "afforded the widest ambit of protection").

With regard to outlet and purchaser identity, Shell provides evidence that the two products are sold at overlapping stores to the same market. (Doc. No. 65–5, Coats Dep., July 28, 2010, at 368.) Warren presents no evidence to the contrary. Therefore, this factor weighs somewhat in favor of Shell.

With regard to advertising media identity, Warren presents evidence that it has spent only a small fraction of the amount spent by Shell in its advertising. (Doc. Nos. 62–64, 62–85.) Shell presents no evidence to the contrary. Therefore, this factor weighs in favor of Warren.

With regard to Defendants' intent, there is, as discussed above, some evidence of an intent by Warren to copy ROTELLA. The Court acknowledges, as Warren contends, that there is no conclusive evidence of a bad-faith intent to confuse the public. *See, e.g., American Footwear Corp. v. General Footwear Co. Ltd.,* 609 F.2d 655, 662 (2d Cir.1979). ("one can capitalize on a market or fad created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor.") The Court views the evidence of intent to copy as weighing slightly in favor of a likelihood of confusion.

■ With regard to actual confusion, the Court finds that this factor weighs in Shell's favor as well. "Actual confusion need not be proven, but if consumers have confused the junior mark for the senior mark, this is the best evidence of a likelihood of confusion." *Xtreme Lashes,* 576 F.3d at 230 (citation omitted). Shell's consumer surveys provide some evidence of actual confusion. *See Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 506–07 (5th Cir.1980) (discussing use of survey evidence to demonstrate likelihood of confusion).[16] The survey indicated a 51.7% confusion rate between RO-TELLA and LUBRIGUARD, which after subtracting noise showed a 34.3% confusion rate. (Golden Report, at 13.) This is well above rates that have been found to evidence likelihood of confusion. *See, e.g. Exxon,* 628 F.2d at 507 (finding survey to be "strong evidence" where "15 percent of the individuals surveyed associated the Texon sign with EXXON," "23 percent . . . with gasoline, a gas station, or an oil company," and "seven percent . . . with defendant's corporation"); *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 278–79 (7th Cir.1976) (15% confusion rate demonstrated likelihood of confusion); 6 McCarthy § 32:185 (citing cases). Despite the flaws in the survey which, as discussed above, reduce its probative value, the Court finds that the high confusion rate weighs somewhat in favor of a finding of a likelihood of confusion.[17]

---

**15.** In its Memorandum, Warren does not argue that the trade dress is weak, but rather focuses on the argument the presence of the ROTELLA name and the Shell logo reduce the risk of confusion. (Doc. No. 61, at 16–17.)

**16.** The Court recognizes that "survey evidence is circumstantial, not direct, evidence of the likelihood of confusion." 6 McCarthy § 32:184.

**17.** With respect to the Internet message board comments cited by Shell as evidence of actual confusion, the Court agrees with Warren that there are serious issues with authentication, among other things. However, because genuine issues of material fact exist whether or not the Court considers the comments, the Court need not rule on their admissibility.

Finally, with regard to the level of care exercised by potential purchasers, courts have often noted that with "relatively inexpensive" items, "a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Xtreme Lashes,* 576 F.3d at 231 (quoting *Smack Apparel,* 550 F.3d at 483). In this case, both products retail for under $10, so purchasers might exercise less care in selecting them. Warren argues that purchasers of heavy-duty motor oil are "sophisticated commercial consumers" and are "very brand-loyal." (Doc. No. 61, at 18–19.) The Court acknowledges that the type of product involved in this case might indeed increase the care exercised. Nonetheless, the Court finds that the weight of authority counsels a finding that this factor weighs slightly in Shell's favor.

Overall, the Court finds that there is ample evidence suggesting that there may be a likelihood of confusion between ROTELLA and LUBRIGUARD. Numerous factual issues remain that should be resolved by the jury, so summary judgment of no likelihood of infringement is inappropriate.

#### 4. Common Law Claims

Warren also moves for summary judgment on Shell's common law claims for trade dress infringement/unfair competition, misappropriation, and conspiracy. Shell did not respond to these arguments in its Response brief.

#### a. Trade Dress Infringement/Unfair Competition

■■■ Warren acknowledges that "[t]he issues in a common law trademark infringement action under Texas law are no different than those under federal trademark law." (Doc. No. 61, at 24 (quoting *All Am. Builders Inc. v. All Am. Siding of Dallas, Inc.,* 991 S.W.2d 484, 488 (Tex. App.-Fort Worth 1999, no pet.)).) Because the Court finds that genuine issues of material fact remain as to Shell's federal trade dress infringement claim, it also finds that factual issues remain with regard to Shell's common law trade dress infringement/unfair competition claim. Accordingly, summary judgment is denied as to that claim.

#### b. Misappropriation

■■■ To prove a misappropriation claim under Texas law, a plaintiff must show "(i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a 'free ride') because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff." *U.S. Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 218 (Tex.App.-Waco 1993, writ denied). Warren provides a good deal of evidence that it spent large amounts of time, labor, skill, and money developing LUBRIGUARD. (*See* Doc. No. 61, at 24 (citing deposition testimony)). Shell has not responded by pointing to any evidence of its own expenditures in creating ROTELLA or of commercial damage as a result of misappropriation. As a result, the Court finds it appropriate to grant Warren's Motion for Summary Judgment as to the misappropriation claim.

#### c. Conspiracy

■■■ Civil conspiracy in Texas requires: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Tri v. J.T.T.,* 162 S.W.3d 552, 556 (Tex. 2005). Thus, conspiracy itself does not give rise to liability in Texas, but rather requires an underlying act. *Carroll v.*

*Timmers Chevrolet, Inc.,* 592 S.W.2d 922, 925 (Tex.1979). Warren moves for summary judgment on the conspiracy claim on the grounds that Shell has not proven any underlying tort, and does not appear to challenge the sufficiency of evidence with regard to the other elements of conspiracy. (Doc. No. 61, at 24–25.) Because the Court finds that factual issues remain with regard to the common law trade dress infringement/unfair competition claim, summary judgment is also inappropriate on the conspiracy claim.

## IV. CONCLUSION

For the reasons discussed in this order, Warren's Motion to Strike (Doc. No. 60) is **DENIED;** Warren's Motion for Summary Judgment (Doc. No. 61) is **GRANTED IN PART AND DENIED IN PART;** and Shell's Motion for Summary Judgment (Doc. No. 58) is **DENIED.**

**IT IS SO ORDERED.**